IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WWTS B.V., INEXT HOLDING B.V., DIGINEXT B.V. and MULTINEXT B.V., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| SMITH MICRO SOFTWARE, INC. | ) ) | Demand for Jury Trial |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs, WWTS B.V., Inext Holding B.V., Diginext B.V. and Multinext B.V. (jointly referred to herein as "Diginext"), by their undersigned attorneys, for their complaint against Smith Micro Software, Inc. ("Smith Micro"), allege as follows:

## PRELIMINARY STATEMENT

1.     Diginext brings this action against Smith Micro to enjoin Smith Micro from entering into any further negotiations or agreements with Diginext's customers, and from using Diginext's confidential pricing for its competitive advantage, as well as an award for the termination fee, compensatory damages, out-of-pocket damages, punitive damages, and attorney's fees.

2.     The basis for these claims is that Smith Micro wrongfully obtained through improper means confidential pricing information concerning Diginext's existing customer relationships, based upon Smith Micro's false pretense that it intended to make a good faith offer to purchase Diginext. Under the applicable law, injunctive relief is appropriate and authorized to prevent the improper inevitable misuse of this information by Smith Micro.

## PARTIES

3.      Plaintiff WWTS B.V., a Netherlands Antilles company, and Inext Holding B.V., Dignext B.V. and Multinext B.V., Netherlands companies, are affiliated companies, with their principal place of business in Amstelveen, the Netherlands.

4.      Defendant, Smith Micro Software, Inc., is a Delaware company, with its principal place of business in Aliso Viejo, California.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties' citizenship is diverse and the matter in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because, as a Delaware corporation, defendant resides in Delaware.  In addition, pursuant to the Exclusivity Agreement (described below), defendant agreed to venue in the Delaware courts.

## GENERAL ALLEGATIONS

7.      Diginext is a European based company which has become a leading provider of connection and configuration software for internet service providers.  Its software provides integrated solutions for advanced internet technology.  Its recently introduced MultiNet product provides a simple way of connecting to the Internet for corporate mobile end-users which automatically detects the connections, selects the user's devices, networks and operator settings, instantly configuring all these to the desired set up, and provides for an instant connection by just starting up a laptop, and supports no fewer than 17 different languages.   It supports over 200 operators worldwide, which makes it possible to connect wirelessly with MultiNet Practically everywhere.  Diginext has rapidly

2

and steadily established customer relationships with the major internet service providers and operators throughout Europe, including Vodafone Global, O2 Group, Connex, Telfort, Telindus, Swisscom Mobile, and Siemens.

8.     In February 2005, Smith Micro was looking for ways to attempt to expand into the European market, with an eye on gathering as much information as possible about Diginext's successful efforts in Europe.

9.     On February 3, 2005, Smith Micro's vice president of business development Bruce T. Quigley made an unsolicited telephone call to Diginext's president Edsard Ravelli on Mr. Ravelli's cell phone, and claimed that he was interested in purchasing Diginext. He claimed that it was a "make or buy" decision, because Smith Micro needed to establish a foothold in Europe, as the markets had already been divided in the United States.

10.     During a conference call on February 7, 2005, between Smith Micro's president William Smith, Mr. Quigley, and Mr. Ravelli, Diginext provided Smith Micro with some preliminary financial information concerning Diginext, and Smith Micro mentioned a possible valuation of Diginext in a range of $6 million to $16 million.

11.     On February 28, 2005, after an exchange of emails, the companies entered into a confidentiality agreement. The agreement established the conditions under which Diginext would agree to provide Smith Micro with additional confidential proprietary information concerning Diginext's intellectual property, technology properties, employees, finances, businesses and operations. The agreement provided, among other things, that Smith Micro agreed that it would not use the proprietary information for any purpose other than in connection with the evaluation or implementation of the contemplated purchase of Diginext. It further provided that Smith Micro

3

would immediately return all written data provided by Diginext at Diginext's first request, that Smith Micro would subsequently confirm in writing that none of its companies, employees or advisors have saved any such data, and that Smith Micro would further see to it that all notes be returned.

12.    On March 1, 2005, only one day after receiving the signed confidentiality agreement, Mr. Quigley sent Diginext a detailed list of the highly sensitive confidential proprietary information which Smith Micro wanted from Diginext, including the following:

1)    Income statements, historical by quarter;

2)    Balance sheet, including debt assessment, and receivables assessment;

3)    Financial forecasts;

4)    Customer information, including revenue and projections, for current customers, customers in the pipeline, and copies of customer agreements;

5)    Product information, including list of products, current versions and roadmaps for future enhancements, licensed technology, and patents;

6)    List of suppliers including contracts;

7)    List of all non-disclosure agreements;

8)    Inventory information, including equipment and facilities;

9)    Litigation information.

13.    In an email dated March 1, 2005, Diginext responded to Smith Micro by noting Smith Micro's "swift response and enthusiasm." At the same time, Diginext expressed reservations about immediately providing Smith Micro with all of the information requested, due to the time involved in preparing the information and the confidential nature of the information. Diginext requested assurance from Smith Micro that it was truly interested in purchasing Diginext, and some

4

commitment concerning valuation of Diginext to ensure that Diginext and Smith Micro were "on the same page, chapter, or reading completely different books."

14.    Throughout March 2005, Smith Micro continued to pressure Diginext to provide additional confidential information, in emails dated March 8, 14, 28, and 30, 2005, urgently asking Diginext's representatives questions such as: "Any idea of when I might receive the due diligence material?", or "Do you have anything you can send me yet?".

15.    On March 31, 2005, in reliance upon Smith Micro's representations that it was sincerely interested in purchasing Diginext, Diginext went ahead and provided Smith Micro with a highly confidential memorandum concerning Diginext's company's products, sales strategies, customer information, customer relationship, and future plans. It included information about its future plans for development of its technology, the status of its negotiations with various service providers, its current and planned pricing, its sales strategies and procedures for obtaining new customers, and its financial statements, including costs of sales, expenses, and revenues. Together with this information Diginext sent Smith Micro a cover letter, which stated that: "It's your turn now" and requested that Smith Micro provide a good faith offer based upon the confidential information provided.

16.    Instead of making an offer, Smith Micro responded on April 4, 2005 with a request for additional specific highly confidential information. Among other things, Smith Micro requested additional detailed information concerning pricing, products, license fees, costs, royalty costs, subscription fees, bundling of products, duration and terms of contracts.

17.    On April 6, 2005, Diginext responded to these additional questions, by providing Smith Micro with additional detailed information concerning Diginext's products, customer

5

relationship models, pricing, license fees, costs, royalty costs, subscription fees, bundling of products, duration and terms of contracts.

18.    On April 6, 2005, Smith Micro responded to Diginext's email, by providing further reassurance in an email that it was truly interested in acquiring Diginext and integrating the operations of both companies.

19.    On April 12, 2005, Smith Micro provided Diginext with an offer letter, in which it further represented that, as a result of its preliminary due diligence, it remained committed to pursuing an acquisition of Diginext.  It represented that it was convinced of the merits of pursuing an acquisition of Diginext and desired to continue the negotiation process.  It requested additional confidential information, including audited quarterly financials, customer contracts, license revenues, customer pipeline and financial forecasts.  As a preliminary offer, it offered to pay $6 million to $15 million for Diginext's businesses and assets.

20.    In response, on April 15, 2005, Diginext responded by saying that it was not willing to provide further information, based on the April 12, 2005 offer, because the range of the offer was too wide and did not accurately reflect the value of the company.  Moreover, the offer was no more specific than the initial range which Smith Micro had suggested in early February 2005 when the parties had first begun their talks, and before Diginext had even provided them with the confidential proprietary information concerning the company, its products, customers, and operations.

21.    In the discussions prior to May 2005, Diginext explained to Smith Micro that Diginext used four different business models or licensing models in terms of its customer relationships, including outright purchase, site license, per user license, and free model.

6

22.    On May 5, 2005, in order to induce Diginext to provide additional highly confidential proprietary information concerning its products and customer relationships, Smith Micro made a revised offer of $10 million to $20 million.  It represented that it continued to have a "strong interest" in acquiring Diginext.

23.    On May 20, 2005, Smith Micro provided Diginext with a draft exclusivity agreement, which would govern further negotiations and disclosure of information.  The initial draft of the agreement was drafted in a one-sided manner, without reasonable protections and assurances to Diginext.  In response, Diginext requested specific assurance that if the due diligence was consistent with the prior information provided by Diginext and if Diginext incurred substantial costs during the negotiation process, that Smith Micro would make an offer in the range which Smith Micro had already proposed.

24.    On June 6, 2005, in a conference call between Smith Micro and Diginext representatives, Smith Micro provided further specific assurance that it intended to continue with the due diligence and negotiations, and that it intended to make an offer in the range of $10 million to $20 million.

25.    On June 10, 2005, based upon Smith Micro's further assurances, Diginext proceeded to sign a revised exclusivity agreement ("Exclusivity Agreement"), and proceeded to provide Smith Micro on June 20, 2005 with Diginext's annual financial statements for 2002, 2003, 2004, and projections for 2005-2007, broken out by license/maintenance/customization fees and by customers.

26.    These financial statements and projections provided a blueprint for competition by any competitor, such as Smith Micro.  These financial statements showed the current and projected income from each existing customer and prospect for maintenance, customization, and license fees,

and provided the specific prices charged or to be charged by Diginext for each customer or prospect for the license fees and the number of users for Diginext's contracts with each of its customers and prospects, including Vodafone, O2, Connex, T-Mobile, Siemens, DNA Finland, Sierra Wireless, Mobistar Beligie, Funk Enterprises, and Life Telecom. Diginext revealed to Smith Micro the specific prices which it charges and the number of licenses for Connex, Siemens, Sierra Wireless, and Life Telecom, and the annual maintenance charges, customization fees, and license fees collected from those companies, as well as Vodafone, O2, T-Mobile, Motorola, DNA Finland, Mobistar Belgie, and Funk Enterprises.

27.    As a result, Smith Micro has gained an understanding of Diginext's pricing with respect to these customers and its pricing for customers in general. Smith Micro can use this information to its competitive advantage in responding to any requests for proposals. This information is not generally publicly available. At the same time, Diginext has no information about Smith Micro's pricing.

28.    The specific information that was provided to Smith Micro concerning its existing customer relationships – which included the specific prices and numbers of users – constituted a trade secret.

29.    It was agreed on June 23, 2005 in discussions with Smith Micro representatives concerning the aforementioned financial statements that Smith Micro representatives would come to the Netherlands on June 27, 2005 to visit Diginext's offices and conduct due diligence. It was mutually agreed that it was important for Smith Micro to come on this date, because representatives on both sides were going to be going on vacation soon after that date, and any rescheduling would cause a major delay.

8

30.     The Exclusivity Agreement provided that Smith Micro representatives would visit Diginext and conduct due diligence between June 10, 2005, and July 15, 2005. It further provided that during an agreed exclusivity period, from June 10, 2005, through August 12, 2005, Diginext would not engage in any discussions with any other party concerning a possible acquisition of Diginext, and that Diginext would terminate any on-going discussions. The Exclusivity Agreement further provided that for a one year period from June 10, 2005 to June 9, 2006, Diginext would not solicit any of Smith Micro's employees.

31.     The Exclusivity Agreement made clear -- both explicitly and implicitly -- that Smith Micro was agreeing to continue its due diligence in good faith and to present a good faith offer by August 12, 2005. Among Diginext's non-exclusive remedies for Smith Micro's failure to make a good faith offer by August 12, 2005, it was agreed that Diginext would be entitled to a $25,000 termination fee, which would be immediately due and payable, if Smith Micro terminated negotiations without making a good faith offer.

32.     The Exclusivity Agreement provided that the parties mutually agreed that money damages would not be a sufficient remedy for any breach of the agreement; that all parties shall be entitled to equitable relief, including injunction and specific performance, as a remedy for such breach; and that such remedies shall not be deemed to be the exclusive remedies.

33.     Despite their prior confirmation, Smith Micro representatives did not show up at Diginext on the scheduled visit date of June 27, 2005, and Smith Micro did not call to explain their failure to arrive.

34.     On July 5-6, 2005, Diginext finally heard from Smith Micro when Mr. Quigley left a voicemail stating that Smith Micro could not come to Diginext because something "critical"

9

happened.  The "critical" event was apparently the fact that Smith Micro was busy finalizing its purchase of Allume Systems.

35.    In a webcast in early July 2005 concerning the announcement of Smith Micro's purchase of Allume Systems, Mr. Smith was asked if Smith Micro was considering purchasing any other companies, and he did not mention any other possible acquisitions.

36.    On July 5, 2005, Diginext sent Smith Micro an email congratulating Smith Micro on the purchase of Allume Systems, and asking for information about the status of Smith Micro's due diligence and negotiations with Diginext.  Smith Micro did not respond to this email.

37.    In July 2005, after persistent efforts, Mr. Ravelli finally reached Mr. Quigley.  When asked what was happening with the due diligence and negotiations, Mr. Quigley only stated that they were disappointed that they saw no license fees from Vodafone.

38.    This explanation did not make any sense for a number of reasons.  First, in the discussions on June 23, 2005 concerning the financial statements, Smith Micro had not even asked any questions about the Vodafone license fees, or expressed any concerns about these fees.  Second, the financial figures in the financial statements provided on June 20, 2005 were actually better than the information which had been provided in the March 31, 2005 confidential memorandum. Specifically, the current and future net turnover and profit figures were actually higher in the June 20, 2005 financial statements compared to the March 31, 2005 statements.  Third, Diginext had disclosed to Smith Micro its four different business models or licensing models prior to June 2005. Fourth, when Smith Micro originally contacted Diginext (unsolicited) and expressed its apparent interest in purchasing Diginext, Smith Micro claimed that it was interested in purchasing Diginext

10

mainly for strategic reasons to get a foothold for entry into the European market, rather than revenue considerations.

39.     In their last conversation together, Mr. Quigley promised Mr. Ravelli that he would get back to him to discuss the matter further.  He never did.

40.     Diginext did not hear anything further from Smith Micro.  Smith Micro ceased all good faith negotiations with Diginext soon after it obtained the highly confidential financial and customer information in the June 20, 2005 financial statements and projections, which it had sought. Smith Micro never came to visit Diginext to conduct due diligence.  Smith Micro never made a good faith offer.

41.     The fact that Smith Micro never even bothered to actually visit Diginext before ceasing all communications further demonstrates its lack of good faith.   At the time it ceased communications in July 2005, Smith Micro had not even met Diginext's owners and officers in person.  It had not even reviewed its original financial records and contracts.   Such a visit to a company is the most basic and elementary step of any due diligence review for the purchase of another company.   Without such a visit, Smith Micro did not even have the opportunity to meet the company's owners or to understand its business.  Instead, as soon as Smith Micro obtained the confidential pricing information for Diginext's customers, it ceased all communication with Diginext.

42.     Thereafter, Smith Micro did not provide any explanation to Diginext for ending the negotiations, and failed to even send the termination fee or to return the confidential information despite threats of legal action.  This inaction further demonstrates Smith Micro's bad faith.

43.     Instead, Diginext was required to make repeated demands on Smith Micro with regard to the termination fee, which were met with silence.  Diginext repeatedly demanded the termination fee from Smith Micro in various communications, including emails on July 15, August 15, and September 8, 2005, to which Smith Micro did not respond.  Finally, on September 13, 2005, after numerous attempts to contact Smith Micro, Smith Micro responded to Diginext by offering to make the $25,000 payment, but only if Diginext would sign a complete release of any claims against Smith Micro.  Diginext did not respond to this email, and Smith Micro never sent the payment for the termination fee.

44.     Smith Micro never paid the termination fee, despite the fact that Diginext even threatened legal action if payment was not made.  Smith Micro knew how to send payment to Diginext, but it unjustifiably failed to do so.  After Diginext made a final demand for payment to Smith Micro on October 28, 2005, Smith Micro concocted a story that it had in fact sent Diginext a check by regular mail on October 10, 2005, for $25,000, without requiring a release, in light of the fact that Diginext had refused to sign the release.  This story is not true for a number of reasons.  First, Diginext never received any check.  Second, it makes no sense that Smith Micro would have sent the check by regular mail, when Smith Micro had Diginext's bank information and Smith Micro had previously sent every document to Diginext by DHL.  Third, Diginext has never had any problems in receiving mail from the United States.  Fourth, Smith Micro did not even know Diginext's position with regard to the release at the time it supposedly sent the check.

45.     On October 28, 2005, Diginext's attorneys sent Smith Micro a demand letter which demanded, among other things, that Smith Micro return all of the confidential pricing information, refrain from using the information to its competitive advantage, pay the termination fee, and pay

other damages. Despite this specific demand, Smith Micro has not returned the confidential pricing information, Smith Micro has not provided written assurance that it would not use the pricing information to its competitive advantage, and Smith Micro has not paid the termination fee or other damages.

46.    Diginext invested a significant amount of time and resources into the negotiations, and incurred substantial costs as a result of being induced to enter into negotiations with Smith Micro and to provide the confidential business information to Smith Micro, including but not limited to accounting fees, attorney's fees, lost man-hours, and other substantial out-of-pocket costs.

47.    It is clear from the facts including Smith Micro's conduct that Smith Micro never had any good faith intent to make a good faith offer to purchase Diginext.

48.    Moreover, it is clear, based upon Smith Micro's actions, that its intent was -- from the beginning of its unsolicited overtures to Diginext -- to obtain as much confidential information as possible about Diginext's company, products, product plans, revenue, pricing, business plans, customers, and customer relationship, based upon a scheme of false representations concerning its intent to make an offer for the purchase of Diginext.

49.    It is likewise clear that Smith Micro was eager to obtain information about the terms of Diginext's contracts with its customers, including Vodafone. As soon as it obtained this information, it ceased all communication with Diginext.

50.    Smith Micro obtained these trade secrets by improper means, under the false pretense that Smith Micro intended to make a good faith offer to purchase Diginext. As outlined above, Smith Micro never had such an intention, never even carried through with the basic due diligence, and never made a good faith offer.

51.     It is inevitable -- in light of the fact that Smith Micro and its employees have this information -- that Smith Micro will use this confidential pricing information when making proposals and bids to Diginext's existing and potential customers to provide the identical competing services.

52.     Under the applicable law, Diginext is entitled to injunctive relief to prevent the inevitable misuse of this information. Diginext is entitled to injunctive relief against Smith Micro to prevent Smith Micro from engaging in any further negotiations or entering into any contracts with Diginext's customers and to otherwise prevent the inevitable misuse of the confidential pricing information that was provided to Smith Micro, based upon the false pretense that it intended to make a good faith offer to purchase Diginext.

53.     Smith Micro's actions were undertaken recklessly and with willful and wanton disregard of the rights of Diginext, such that Diginext is entitled to recovery of both compensatory and punitive damages.

## COUNT I - UNIFORM TRADE SECRETS ACT

54.     Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

55.     Smith Micro obtained Diginext's trade secrets and confidential business information through improper means.

56.     There is a likelihood that Smith Micro will misuse this confidential business information to its advantage in its discussions and relationship with Diginext's existing and potential customers.

14

57.     Under the Uniform Trade Secrets Act, Diginext is entitled to injunctive relief, damages, punitive damages, attorney's fees and costs, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT II - UNFAIR COMPETITION

58.     Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

59.     Smith Micro engaged in unfair competition by obtaining confidential business information from a competitor through improper means.

60.     Diginext is entitled to injunctive relief, damages, punitive damages, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT III - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

61.     Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

62.     Smith Micro breached its duty of good faith and fair dealing in connection with its negotiations with Diginext and carrying out the Exclusivity Agreement.

63.     Smith Micro's breach of its duty of good faith and fair dealing caused damages to Diginext.

64.     Diginext is entitled to injunctive relief, damages, punitive damages, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT IV - BREACH OF THE DUTY TO NEGOTIATE IN GOOD FAITH

65.     Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

66.     Smith Micro breached its duty to negotiate in good faith in connection with the Exclusivity Agreement.

15

67.     Smith Micro's breach of the duty to negotiate in good faith caused damages to Diginext.

68.     Diginext is entitled to injunctive relief, damages, punitive damages, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT V - FRAUDULENT MISREPRESENTATIONS

69.     Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

70.     Smith Micro made material false representations to Diginext, including among others, the representations that it was interested in purchasing Diginext, that it would continue its due diligence, that it would continue the negotiations, that it would make a good faith offer to purchase Diginext, and that it wanted and intended to use the confidential pricing information only for the purpose of deciding on a forthcoming offer price.

71.     Diginext reasonably relied upon these false representations to its detriment, in that based on those representations, Diginext disclosed valuable confidential business information which it would not have otherwise disclosed, and the disclosure of which could place Diginext at a competitive disadvantage, and which caused Diginext to incur the expense of continuing discussions and negotiations with Smith Micro.

72.     Smith Micro knew or reasonably should have known at the time of making thee false representations that the representations were false.

73.     Diginext is entitled to injunctive relief, damages, punitive damages, interest, and such further legal and equitable relief the Court deems appropriate.

16

## COUNT VI - FRAUDULENT INDUCEMENT

74.    Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

75.    Smith Micro fraudulently induced Diginext to enter into the Exclusivity Agreement and to provide the confidential business information based upon material false representations.

76.    Diginext reasonably relied upon these material false representations to its detriment in entering into the Exclusivity Agreement, in that based on those representations, Diginext disclosed valuable confidential business information which it would not have otherwise disclosed, and the disclosure of which could place Diginext at a competitive disadvantage, and which caused Diginext to incur the expense of continuing discussions and negotiations with Smith Micro.

77.    Diginext is entitled to injunctive relief, damages, punitive damages, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT VII - PROMISSORY ESTOPPEL

78.    Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

79.    Smith Micro made promises to Diginext with the reasonable expectation to induce action or forbearance on the part of Diginext.

80.    Diginext reasonably relied on the promises and took action to its detriment.

81.    Injustice can be avoided only by enforcement of the promises.

82.    Diginext is entitled to injunctive relief, damages, punitive damages, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT VIII - BREACH OF CONTRACT

83.    Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

17

84.     Smith Micro breached its contractual obligations by failing to pay the termination fee under the Exclusivity Agreement and failing to return the confidential business information.

85.     Diginext suffered damages as a result of this breach.

86.     Diginext is entitled to judgment against Smith Micro for injunctive relief, damages, interest, and such further legal and equitable relief the Court deems appropriate.

## COUNT IX – ACCOUNT STATED

87.     Diginext incorporates the allegations of paragraphs 1 through 53 set forth above.

88.     Diginext sent Smith Micro an invoice, which was received and accepted by Smith Micro, for the termination fee, provided under the terms of the Exclusivity Agreement.

89.     Smith Micro failed to pay the invoice, and did not object to the invoice within a reasonable time.

90.     Smith Micro is liable to Diginext for the amount of the invoice.

91.     Diginext is entitled to judgment against Smith Micro for the amount of the invoice, interest, and such further legal and equitable relief the Court deems appropriate.

WHEREFORE, Plaintiffs demand judgment against Defendant Smith Micro for the following:

A.     Injunctive relief barring Smith Micro, directly or indirectly, from soliciting or doing any business with any of Diginext's existing or potential customers, including but not limited to Vodafone, O2, Connex, T-Mobile, Siemens, DNA Finland, Sierra Wireless, Mobistar Beligie, Funk Enterprises, and Life Telecom, for whom Diginext disclosed confidential customer information to Smith Micro;

18

B.     Injunctive relief barring Smith Micro from using the confidential business information provided to Smith Micro to its competitive advantage;

C.     Injunctive relief requiring Smith Micro, including its companies, employees and advisors, to return or destroy all documents or data containing any of the confidential business information provided to Smith Micro;

D.     Damages, including but not limited to compensatory damages, recissory damages, contract damages, out-of-pocket damages, and reliance damages;

E.     Punitive damages for Smith Micro's reckless actions in wanton disregard for the rights of Diginext;

F.     Attorney's fees and costs;

G.     Interest; and

H.     Such further legal and equitable relief the Court deems just and appropriate.

Dated:      November 8, 2005

Respectfully submitted,

David L. Finger (DE Bar ID. #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorneys for Plaintiffs

Of counsel:
David T. Azrin, Esq.
Gallet Dreyer & Berkey LLP
845 Third Avenue – 8th Floor
New York, New York 10022
(212) 935-3131

19